UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TURMURIA BEACH, | |
| Plaintiff, | Case No. 3:24-cv-00915 |
| v. | Chief Judge William L. Campbell, Jr. |
| | Magistrate Judge Alistair E. Newbern |
| OFFICE OF APPELLATE OPERATIONS, | |
| Defendant. | |

To:     The Honorable William L. Campbell, Chief District Judge

## REPORT AND RECOMMENDATION

Pro se Plaintiff Turmuria Beach filed this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of the Social Security Administration (SSA) denying her applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401–433, and supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. (Doc. No. 1.) The Court referred this action to the Magistrate Judge to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. No. 21.) Beach applied for and was granted leave to proceed *in forma pauperis*. (Doc. Nos. 2, 10.)

Before the Court is Beach's handwritten motion (Doc. No. 16) that the Magistrate Judge has construed as a motion for judgment on the administrative record (Doc. No. 17), to which the Commissioner has responded in opposition (Doc. No. 20). Having considered the parties'

arguments and the administrative record (Doc. No. 12[1]) as a whole, and for the reasons that follow, the Magistrate Judge will recommend that the Court deny Beach's motion and affirm the Commissioner's decision.

## I.     Background

### A.     Beach's DIB and SSI Applications

Beach applied for DIB and SSI on September 14, 2020, alleging that she has been disabled and unable to work since December 15, 2019, as a result of bipolar disorder, post-traumatic stress disorder (PTSD), obesity, and knee problems. (AR 324, 345.)

The Commissioner denied Beach's applications initially and on reconsideration. (AR 366, 367, 395, 396.) At Beach's request, an administrative law judge (ALJ) held a virtual hearing regarding her applications on January 4, 2023. (AR 83–119, 439–42.) Beach appeared with counsel and testified. (AR 85, 88, 92–111.) The ALJ also heard testimony from a vocational expert. (AR 111–17.) At the hearing, Beach amended her alleged disability onset date to July 21, 2020.[2] (AR 96–97.)

### B.     The ALJ's Findings

On February 7, 2023, the ALJ issued a written decision finding that Beach was not disabled within the meaning of the Social Security Act and applicable regulations and denying her claims for DIB and SSI. (AR 52–82.) The ALJ made the following enumerated findings:

---

[1]     The transcript of the administrative record (Doc. No. 12) is referenced herein by the abbreviation "AR." All page numbers cited in the AR refer to the Bates stamp at the bottom right corner of each page.

[2]     The record shows that Beach previously applied for DIB and SSI benefits on September 27, 2018. (AR 304.) The Commissioner denied those applications initially and on reconsideration and, after holding a telephonic hearing on her applications at Beach's request, an ALJ issued a written decision denying Beach's applications on July 20, 2020. (AR 304–316.)

1.      [Beach] meets the insured status requirements of the Social Security Act through December 31, 2022.

2.      [Beach] has not engaged in substantial gainful activity since July 21, 2020, the amended alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.      [Beach] has the following severe impairments: bilateral knee osteoarthritis status post arthroscopic surgery left and right total knee replacement; degenerative disc disease of the lumbar and cervical spine; hernia of anterior abdominal wall; history of gastric bypass; asthma; obstructive sleep apnea; morbid obesity; post-traumatic stress disorder (PTSD); depressive disorder; and bipolar disorder (20 CFR 404.1520(c) and 416.920(c)).

                    *       *       *

4.      [Beach] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

                    *       *       *

5.      After careful consideration of the entire record, the undersigned finds that [Beach] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [Beach] can stand and walk for 4 hours in an 8-hour workday, and can sit for 8 hours in an 8-hour workday. [Beach] can never climb a ladder, rope, or scaffold or crawl. [Beach] can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. [Beach] can perform occasional pushing and pulling with the bilateral lower extremities. [Beach] must avoid work at unprotected heights, must avoid work around moving mechanical parts with vibrations and the use of vibratory tools, and must avoid concentrated exposure to dust, fumes, odors, gases, and poor ventilation. [Beach] can understand and remember simple instructions and can use judgment to make simple work-related decisions. [Beach] can adapt to routine changes in the work setting that are occasional in nature.

                    *       *       *

6.      [Beach] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

                    *       *       *

7.      [Beach] was born on February 15, 1973 and was 47 years old, which is defined as a younger individual age 18–49, on the amended alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      [Beach] has a limited education (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Beach] is "not disabled," whether or not [Beach] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering [Beach]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Beach] can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

*      *      *

11.     [Beach] has not been under a disability, as defined in the Social Security Act, from July 21, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(AR 55–75.) The Social Security Appeals Council denied Beach's request for review on July 12, 2024, making the ALJ's decision the final decision of the Commissioner. (AR 1–7.)

## C.      Appeal Under 42 U.S.C. §§ 405(g) and 1383(c)(3)

Beach filed this action for review on July 24, 2024 (Doc. No. 1), and this Court has jurisdiction under 42 U.S.C. § 405(g). Beach argues that "[her] disability started as a child and it [has] been going on ever[ ] since." (Doc. No. 16, PageID# 2044.) She states that her "mental, physical, [and] emotional illnesses" have "gotten worse" and that she "need[s] help" because she is "not able to work how [she] did years ago." (*Id.* at PageID# 2044, 2045.) Beach states that she has "had several surgeries," including having "both knees replaced three times in less than six months[,] and [she is] still having issues . . . and needs to have another surgery on both knees . . . ." (*Id.* at PageID# 2045.) Beach states that she "can't stand or sit for a long time without pain." (*Id.*) She also states that "[her] blood pressure starting high is an issue for her . . . ." (*Id.*) Beach states that she has "PTSD, an[xiety], . . . bipolar[,]" and "panic attacks . . . ." (*Id.*) She states that she does not "think that [the ALJ] looked at all of [her] records and [she] feel[s] like they don't even care." (*Id.*)

4

The Court liberally construed Beach's motion as a motion for judgment on the administrative record. (Doc. No. 17.) The Commissioner filed a response in opposition to Beach's motion, arguing that the ALJ followed applicable SSA regulations and that substantial record evidence supports the ALJ's determinations. (Doc. No. 20.) Beach did not file an optional reply in support of her motion.

### D. Review of the Record

The ALJ and the parties have thoroughly described and discussed the medical and testimonial evidence in the administrative record. Accordingly, the Court will discuss those matters only to the extent necessary to address the parties' arguments.

## II. Legal Standards

### A. Standard of Review

This Court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings are supported by substantial evidence and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is less than a preponderance but "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 103 (quoting *Consol. Edison Co.*, 305 U.S. at 229); *see also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (same). Further, "[t]he Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed."

*Gentry*, 741 F.3d at 723. Where an ALJ fails to follow those rules or regulations, "we find a lack of substantial evidence, 'even where the conclusion of the ALJ may be justified based upon the record.'" *Miller*, 811 F.3d at 833 (quoting *Gentry*, 741 F.3d at 722).

## B. Determining Disability at the Administrative Level

DIB and SSI benefits are available to individuals who are disabled, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (explaining that this definition applies in the DIB and SSI contexts).

ALJs must employ a "five-step sequential evaluation process" to determine whether a claimant is disabled, proceeding through each step until a determination can be reached. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). For purposes of this case, the regulations governing disability determination for DIB and SSI benefits are identical. *See Colvin*, 475 F.3d at 730 (citing 20 C.F.R. §§ 404.1520, 416.920). At step one, the ALJ considers the claimant's work activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). "[I]f the claimant is performing substantial gainful activity, then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step two, the ALJ determines whether the claimant suffers from "a severe medically determinable physical or mental impairment" or "combination of impairments" that meets the 12-month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "If the claimant does not have a severe impairment or combination of impairments [that meets the durational requirement], then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step three, the ALJ considers whether the claimant's medical impairment or impairments appear on a list maintained by the SSA that "identifies and defines impairments that are of sufficient severity as to prevent any gainful activity." *Combs v.*

*Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); *see* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled." *Miller*, 811 F.3d at 834 n.6. If not, the ALJ proceeds to step four. *Combs*, 459 F.3d at 643; *see also Walker v. Berryhill*, No. 3:16-1231, 2017 WL 6492621, at *3 (M.D. Tenn. Dec. 19, 2017) (explaining that "[a] claimant is not required to show the existence of a listed impairment in order to be found disabled, but such showing results in an automatic finding of disability and ends the inquiry"), *report and recommendation adopted*, 2018 WL 305748 (M.D. Tenn. Jan. 5, 2018).

At step four, the ALJ evaluates the claimant's past relevant work and "'residual functional capacity,' defined as 'the most [the claimant] can still do despite her limitations.'" *Combs*, 459 F.3d at 643 (alterations in original) (quoting 20 C.F.R. § 404.1545(a)(1)); *see* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Past work is relevant to this analysis if the claimant performed the work within the past 15 years, the work qualifies as substantial gainful activity, and the work lasted long enough for the claimant to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). If the claimant's residual functional capacity (RFC) permits her to perform past relevant work, she is not disabled. *Combs*, 459 F.3d at 643. If a claimant cannot perform past relevant work, the ALJ proceeds to step five and determines whether, "in light of her residual functional capacity, age, education, and work experience," a claimant can perform other substantial gainful employment. *Id.* While the claimant bears the burden of proof during the first four steps, at step five the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). "Claimants who can

perform such work are not disabled." *Combs*, 459 F.3d at 643; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## III.    Analysis

Beach's arguments, liberally construed, challenge the ALJ's determination that she is not disabled under SSA regulations because, despite her physical and mental impairments, Beach has the residual functional capacity (RFC) to perform a limited range of "light work" as defined by SSA regulations. (Doc. No. 16.)

The ALJ determined that Beach

has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [Beach] can stand and walk for 4 hours in an 8-hour workday, and can sit for 8 hours in an 8-hour workday. [Beach] can never climb a ladder, rope, or scaffold or crawl. [Beach] can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. [Beach] can perform occasional pushing and pulling with the bilateral lower extremities. [Beach] must avoid work at unprotected heights, must avoid work around moving mechanical parts with vibrations and the use of vibratory tools, and must avoid concentrated exposure to dust, fumes, odors, gases, and poor ventilation. [Beach] can understand and remember simple instructions and can use judgment to make simple work-related decisions. [Beach] can adapt to routine changes in the work setting that are occasional in nature.

(AR 60.)

The ALJ provided more than thirteen single-spaced pages of analysis in support of this determination, beginning by articulating the relevant standard for assessing a claimant's symptoms under SSA regulations:

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p. The undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c.

In considering [Beach]'s symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s)

that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce [Beach]'s pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce [Beach]'s pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of [Beach]'s symptoms to determine the extent to which they limit [Beach]'s work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if [Beach]'s symptoms limit the ability to do work-related activities.

[Beach] reports that she is unable to work due to persistent musculoskeletal pain, and ongoing symptomology associated with a hernia, a history of gastric bypass surgery, asthma, and obstructive sleep apnea. In addition to these physical impairments, [Beach] reports ongoing mental health issues associated with post-traumatic stress disorder (PTSD), a depressive disorder, and bipolar disorder. (Hearing Testimony; Exhibit D3E; D4E; D8E; D9E). [Beach] has been prescribed medications to help treat her chronic pain and mental health symptomology, and uses a CPAP to manage her sleep apnea. (Exhibit D12E). However, she testified that the model she uses has been recalled. [Beach] testified that she underwent a right knee replacement, but continues to experience pain and swelling in her leg. She uses a brace on her right knee, and a walker as needed. She also reports worsening issues in her left knee, and states that injections are no longer working to manage her symptomology in this extremity. [Beach] testified that she also experiences significant pain in her back, but does not want to undergo surgery. She also experiences pain in her abdomen related to a hernia, and has seen pain management to help manage neuropathic symptoms. In addition to her physical symptomology, [Beach] reports ongoing issues with PTSD, panic attacks, and bipolar disorder. Despite medication management, she reports that she experiences flashbacks, gets emotional, and does not socialize often with other people. (Hearing Testimony).

The record also routinely notes that [Beach]'s weight is in the obese range. Social Security Ruling 19-2p requires that the undersigned consider the effect obesity has on [Beach]'s ability to perform routine movement and necessary physical activity within the work environment. The combined effects of obesity with another impairment may be greater than the effects of each of the impairments considered separately. Therefore, the undersigned has considered all-work related physical limitations, whether due to [Beach]'s obesity, other impairments, or a combination of impairments.

After careful consideration of the evidence, the undersigned finds that [Beach]'s medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Beach]'s statements concerning the intensity,

persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

The record documents a history of treatment for the aforementioned impairments. (Exhibit D1F; D2F; D3F; D4F; D5F; D6F; D7F; D8F; D10F; D15F; D22F; D25F). [Beach] underwent a left knee arthroscopy with abrasion chondroplasty to the patellofemoral joint with major synovectomy of medial, lateral, and patellofemoral joints on October 27, 2015. (Exhibit D6F/113). She underwent a right knee arthroscopy with partial medial meniscectomy of the anterior horn; abrasion chondroplasty of the patellofemoral joint to bleeding bone; and synovitis of major synovectomy medial and patellofemoral compartments on January 12, 2016. (Exhibit D6F/114). [Beach] underwent a right knee arthroscopy with a partial medial meniscectomy of the medial anterior horn, abrasion chondroplasty to bleeding bone at the patellofemoral joint, and major synovectomy of the medial and patellofemoral compartments on October 18, 2017. (Exhibit D6F/116). A left knee arthroscopy with chondroplasty of the patellofemoral joint and limited synovectomy of the medial and patellofemoral compartments were performed on September 23, 2019. (Exhibit D6F/119; D22F/25). Electrodes for a spinal cord stimulator were placed on October 23, 2019. (Exhibit D7F/18).

[Beach] has continued to seek orthopedic treatment during the relevant period, reporting continued pain in her right knee in September 2020. During the objective examination on that date, [Beach] exhibited limited range of motion, positive patella compression, a positive medial McMurry's, and joint swelling in the right lower extremity. A varus deformity of about 5 degrees was noted, as well as instability with weight-bearing. A custom medial unloader brace was requested, and [Beach] was referred for a physical therapy evaluation. (Exhibit D5F; D6F; D10F). [Beach] also presented to neurosurgery in September 2020, reporting lower back pain. At this appointment, [Beach] reported that she had been fitted for a brace, which was working well when she used it. An MRI of the lumbar spine was ordered. (Exhibit D7F). This imaging revealed mild multi-level degenerative changes, with minimal/mild neural foraminal narrowing at L4-L5 and L5-S1. (Exhibit D7F/12). [Beach] was referred to pain management in September 2020. During this objective examination, palpation of the lumbar facet revealed pain on both sides at the L3-S1 region, and pain was noted over the lumbar intervertebral disc spaces and sacroiliac joint revealed pain. Limited extension and flexion were noted with pain. Bilateral knee joint line tenderness was elicited upon palpation, crepitus was palpated bilaterally, and [Beach] had positive McMurray's bilaterally. However, [Beach]'s gait appeared normal, straight leg raising was normal, and [Beach] had normal strength and sensation in her extremities. Based on her history, examination, and imaging, her main pain generators appeared to be from the SI and lumbar facet joints, as well as osteoarthritis in her knees bilaterally. [Beach] was not interested in injections at that time, but she was prescribed multiple medications in an attempt to manage her symptomology. (Exhibit D18F).

[Beach] presented to neurosurgery for a follow up in October 2020, reporting continued pain in her lower back and leg that was 8 out of 10 o the pain scale. She stated that she did not want to undergo back surgery, so additional physical therapy for her back was recommended. (Exhibit D7F). Bilateral knee crepitus and spinal tenderness were noted during objective examinations in the following months, but [Beach] was ambulatory. (Exhibit D8F). [Beach] continued to attend pain management appointments in November and December 2020, but continued to indicate that she was not interested in injections. (Exhibit D18F). During a neurosurgery appointment in December 2020, [Beach] reported lower back pain radiating to her bilateral hips, buttocks, and lower extremities, with associated numbness and tingling. She also reported posterior neck pain at that time, which radiated into her upper extremities with numbness in both hands. During the objective examination, pain was noted in the lumbar spine, hips, and posterior neck, and sensation was decreased in the L5 distribution in the bilateral lower extremities. Sensation was also decreased in the left hand. However, strength was full in all extremities, and [Beach]'s gait was normal. [Beach] reported that physical therapy helped her back, though she had aches and pains in the cold. [Beach] did not want to participate in more physical therapy at that time, however. She wanted to continue on her current medication regimen and perform further workup of her neck pain and bilateral hand numbness. (Exhibit D23F). [Beach] continued to participate in pain management into 2021, with records from March noting that medications decreased her pain from 10/10 to 8/10 and improved her ability to perform her activities of daily living. During the objective physical examination, tenderness to palpation, crepitus, and minimal swelling were noted in [Beach]'s knees. However, her gait appeared to be normal. Her medications were refilled, and [Beach] requested that injections be ordered to help her with her pain. [Beach] received these injections during an appointment in April. Objective examination findings at that time noted tenderness to palpation and crepitus in the bilateral knees. However, there was no swelling, and [Beach]'s gait appeared to be normal. (Exhibit D18F).

[Beach] underwent a consultative examination in April 2021, reporting persistent issues with pain in her knees. During the objective examination, her gait was antalgic, but her station was normal. She got up out of the chair and got onto and off of the examination table with difficulty, but she used no assistive device as an aid to walking during the evaluation. Her grip grade was 5/5 bilaterally, and she lifted 10 pounds bilaterally on a one-time basis. Her mobility and ability to grasp and manipulate objects were normal. [Beach]'s blood pressure was elevated. [Beach] was unable to see one finger less than 6 inches from her nose, but she did not wear prescription glasses. Her lungs were clear to auscultation bilaterally, with no increased AP diameter, prolonged expiration, or wheezes, rales, or rhonchi. [Beach]'s abdomen was soft, non-distended, and non-tender. [Beach] was tender in the lumbar spine region, and had pain with range of motion and strength testing. Her knees were tender and swollen. However, strength was 5/5 in all major muscle groups. Some limitations in range of motion were noted in [Beach]'s hips and knees, but range of motion was normal in all other areas. Straight leg testing was negative bilaterally, and Romberg testing was negative as well. [Beach] was

diagnosed with osteoarthritis, degenerative disc disease of the lumbar spine, obesity, and migraines by history. (Exhibit D1F).

During a pain management appointment in June 2021, [Beach] reported that her pain medication decreased her pain from 10/10 to 7/10, and improved her mobility and ability to perform her activities of daily living. During the objective physical examination, palpation of the lumbar facet revealed pain on both sides at L3-S1 region, and palpation of the bilateral sacroiliac joints revealed right and left-sided pain. However, [Beach]'s gait appeared normal. [Beach]'s medications were refilled. [Beach] reported no significant changes during a pain management appointment in July 2021, though she remained happy with her treatment regimen. Upon examination, palpation of the lumbar facet revealed pain on both sides at the L3-S1 region. Extension of the lumbar spine was noted to be 25 degrees, and pain was noted with lumbar extension. By August, [Beach] reported that her medications were no longer helping as much as they used to. During the objective examination, palpation of the lumbar facet revealed pain on both side at the L3-S1 region. Her gait remained normal. [Beach]'s medication regimen was adjusted. (Exhibit D18F). Musculoskeletal pain was noted during an annual wellness appointment in August 2021, and crepitus was noted in the bilateral knees upon examination. However, [Beach] was ambulatory with good muscle strength and tone. (Exhibit D17F).

[Beach] reported improvement in her knee and back pain during a pain management appointment in September 2021, stating that following the change in her medications her pain was decreased from 10/10 to 4/10. She reported that her medication allowed for better function and quality of life. During the objective examination, tenderness to palpation was noted in the joint line of the knee, and crepitus was noted. However, [Beach]'s gait again appeared to be normal. Her medication regimen was adjusted again. [Beach] again reported that her pain was reduced to 4/10 with medication during a pain management appointment in October 2021. She also stated that the knee injections had improved her pain for several months, though the benefits of these injections were beginning to wear off. During the objective examination, [Beach] had tenderness to palpation, crepitus and minimal swelling in the knee. Injections were ordered, and [Beach]'s medication regimen was adjusted. She received these injections in November 2021. During this appointment, [Beach] reported no change in her chronic back pain, and reported severe pelvic pain that was not responding to her current medication regimen. However, her back and knee pain was reduced to 5/10 on the pain scale with medication, and her gait continued to be normal during the objective examination. [Beach] had tenderness to palpation of the bilateral knee joint lines, with crepitus and minimal swelling noted. Tenderness to palpation was noted in the abdomen and pelvic area. Further adjustments were made to her medication regimen. (Exhibit D18F). During a primary care appointment in November 2021, crepitus was noted in the bilateral knees, though [Beach] retained normal range of motion and good strength and tone. She was ambulatory, with no muscular tenderness or weakness noted. (Exhibit D17F).

Pain management records in December 2021 note that [Beach]'s back pain was about the same, though her knee pain had improved. Overall, she continued to report that her pain and function were improved with her medication regimen, and stated that pain medication reduced her pain from 10/10 to 3/10. Upon examination, tenderness and crepitus were noted in the bilateral knees, but [Beach] had only minimal swelling and her gait remained normal. Her medication regimen was adjusted again. Pain management records from January 2022 continued to note that [Beach]'s pain was decreased to 3/10 with medication. though palpation of the lumbar facet revealed pain on both sides at the L3-S1 region, [Beach]'s gait remained normal. [Beach] continued to report knee pain in February 2022, and had tenderness and crepitus in the bilateral knees upon objective examination. However, she reported that medication decreased her pain to 4/10, only minimal swelling was noted, and her gait remained normal. (Exhibit D28F). [Beach] presented to the emergency department in March 2022 with left shoulder pain that was worse with movement. However, she denied any radicular pain or numbness, tingling, or weakness. Upon examination, the upper aspect of the left trapezius was taught and tender to palpation, and range of motion of the shoulder was slightly limited due to pain. [Beach]'s symptomology improved when [Beach] placed pressure down on her trapezius, however, and there were no other areas of bony tenderness in the upper extremity. Sensation was intact. Imaging revealed no evidence of left shoulder fracture or malalignment, and relative preservation of mineralization and joint spaces, though old calcified granulomatous disease was noted. (Exhibit D21F). During a follow up appointment after this treatment, she reported that she could not lift above 45 degrees, and was interested in seeing an orthopedic specialist. During the objective examination, muscular tenderness was present in the left shoulder, with limited range of motion. [Beach] could not lift above 45 degrees, and pain to palpation was noted across the top of the shoulder. There was no joint swelling or weakness. [Beach] was referred to an orthopedist. (Exhibit D26F).

Pain management records from March 2022 report that [Beach]'s back pain was stable, and medications decreased her pain from 8/10 to 2/10 on the pain scale. During the objective examination, palpation of the lumbar facet revealed pain on both sides of the L3-S1 region. Her medications were continued. No significant changes were noted in April 2022, and [Beach] reported that medications decreased her pain from 8/10 to 4/10 on the pain scale. During the objective examination, palpation of the lumbar facet revealed pain on both sides of the L3-S1 region. Palpation of the bilateral sacroiliac joint area revealed right and left-sided pain. There was pain noted with extension and flexion, but [Beach]'s gait appeared normal. [Beach] wanted to repeat her knee injections when due, stating they were very helpful. [Beach] reported worsening knee pain in May 2022, and [Beach] again indicated that she wanted to repeat her previous injections. She reported that pain medication continued to decrease her pain from 10/10 to 4/10. Upon objective examination, tenderness to palpation and crepitus were noted in both knees, though there was no swelling, and her gait appeared to be normal. Injections were administered in June 2022. [Beach] reported improvement in her knee pain following these injections. During an appointment in July, she stated that her

prescribed medications reduced her pain from 9/10 to 6/10 on the pain scale. During a pain management appointment in July 2022, [Beach] reported improvement in her knee pain after her injection the previous month, and stated that her prescribed medications decreased her pain from 9/10 to 6/10. During the objective examination, palpation of the bilateral sacroiliac joint revealed right and left sided pain. However, her gait remained normal. (Exhibit D28F).

[Beach] presented to pain management again in August 2022, reporting stable chronic knee pain, and stated her pain medication decreased her pain from 9/10 to 6/10. During the objective examination, [Beach] had tenderness to palpation of the joint line in the bilateral knees, as well as crepitus. There was no swelling noted, and [Beach]'s gait appeared to be normal. (Exhibit D28F). During an annual wellness visit in September 2022, [Beach] reported that her arthritis was "bad", and stated she was considering surgery. During the objective physical examination, crepitus was noted in the bilateral knees, but [Beach] was ambulatory with normal range of motion and good muscle tone and strength. (Exhibit D26F). Pain medication records from this period indicate that [Beach]'s knee pain was stable, and again indicated that her pain medication reduced her pain from 9/10 to 6/10. During the objective examination, palpation of the bilateral sacroiliac joint area revealed right and left sided pain. However, her gait continued to appear normal. (Exhibit D28F). [Beach] presented for treatment of right knee pain in October 2022. During the objective examination, limited range of motion, joint swelling and tenderness, positive patella compression, and positive medial McMurry's were noted. However, there was no crepitus, and sensation was intact to light touch. Imaging revealed varus deformity and bone to bone contact. [Beach] was referred to physical therapy and pain management, and was scheduled for a right total knee replacement. (Exhibit D27F). Continued pain was noted during a pre-operative appointment in October 2022. During the objective examination, [Beach] had limited range of motion, positive patella compression, joint effusion, positive medial McMurry's, and joint swelling in the right lower extremity. (Exhibit D22F). Pain management records noted tenderness to palpation of the right knee joint line with crepitus, and [Beach] was advised to talk to her orthopedic surgeon regarding post-operative pain management. (Exhibit D28F). [Beach] underwent a right total knee arthroplasty on October 24, 2022 (Exhibit D22F/12), and participated in physical therapy following this surgery. (Exhibit D29F).

During a post-operative appointment at the end of October 2022, [Beach] was recovering well. Joint swelling and tenderness were noted at the operative site, but [Beach]'s wound was clean and dry without erythema, purulent, or serous. She was neurovascularly intact, and sensation was intact to light touch. Imaging revealed that [Beach]'s prosthesis was intact with good position and alignment. (Exhibit D27F). [Beach] presented to the emergency department in early November 2022 reporting pain and swelling in the right knee, and she stated she had recently run out of pain medications. During the objective examination, swelling and mild warmth was noted to the right knee, with staples in place. However, her wound appeared well-healing, and she had normal range of motion with no deformity. An x-ray of the knee revealed intact hardware, and imaging ruled out deep vein

thrombosis. Mild elevation was noted in the inflammatory markers. She was discharged home in stable condition. (Exhibit D30F). Pain management records from November 2022 noted left pain, and [Beach] reported that she would eventually need to replace that joint as well. At that time, she reported that her pain medication decreased her pain from 10/10 to 7/10. During the objective examination, palpation of the lumbar facet revealed pain on both sides at the L3-S1 region, as well as pain with extension and flexion. However, her gait appeared normal. Chronic back pain was noted in December 2020, but [Beach] reported that her pain medication decreased her pain from 10/10 to 6/10. [Beach] was noted to be morbidly obese upon examination, but her gait appeared normal. (Exhibit D28F). Physical therapy records from December 2022 note improvement in [Beach]'s symptomology with physical therapy, though she still experienced some weakness and limited range of motion and she required assistance to get leg on/off mat table. However, [Beach] reported that she was participating in significant activities of daily living, such as dancing. She was continued with physical therapy to further improve her functional abilities. (Exhibit D29F).

[Beach] has also received treatment for gastrointestinal and respiratory issues throughout the relevant period. [Beach] reported lower abdominal pain in August, September and October 2020, which she stated had persisted since her gastric bypass surgery. A CT scan had revealed no abnormality. At this time, she reported that she was taking medication for weightloss, and was taking supplements for iron and vitamin D deficiency. Tenderness was noted in [Beach]'s abdomen. [Beach] also reported worsening asthma and fatigue during a treatment appointment in November 2020. (Exhibit D8F). However, no significant treatment for these conditions was noted through the first part of 2021. Records form July 2021 indicate that [Beach] had gained weight since her previous gastric bypass surgery, but she denied abdominal pain or acid reflux. She requested revision of her gastric bypass to allow for more weight loss. During the objective examination, she was described as morbidly obese, with a wellhealed laparoscopic surgical incision on her abdomen. However, other physical examination findings were largely normal. [Beach] was scheduled for further evaluation. (Exhibit D15F; D16F). An upper GI endoscopy was performed on July 22, 2021, which revealed a normal esophagus, a small hiatal hernia, and a Roux-en-Y gastrojejunostomy with gastrojejunal anastomosis characterized by healthy-appearing mucosa. (Exhibit D15F/39; D16F/24).

During an annual wellness visit in August 2021, [Beach] reported burning with urination, as well as ongoing issues with her abdominal hernia. Shortness of breath and palpitations were noted as well. During the objective physical examination, no wheezing was noted, and [Beach]'s lungs were clear to auscultation. These records note normal cardiovascular findings as well, and while edema was present in the extremities, there was no evidence of clubbing or cyanosis. (Exhibit D17F). [Beach] again requested a potential surgical intervention to stimulate weight loss during an appointment in August, and reported persistent abdominal pain. During the objective examination, she was described as morbidly obese, and tenderness was noted throughout the abdomen. [Beach] had a questionable bulge in her mid-

abdomen that was tender to palpation, and the abdominal wall was firm. Other findings were largely normal. [Beach] was informed that there was not much more that could be done surgically to facilitate weight loss, and she was referred to a nutritionist and a plastic surgeon. [Beach] was scheduled for a CT scan to further evaluate the hernia in her abdominal wall. (Exhibit D16F).

A CT scan performed of [Beach]'s abdomen on August 30, 2021 revealed no radiographic evidence of a significant ventral hernia. Prior abdominal wall fascia surgery as well as gastric and prior cholecystectomy were noted, as well as a low-density lesion within the dome of the right lobe of the liver that were consistent with a possible hemangioma, complex cyst, or other etiology. Increased caliber small bowel was noted in the upper left abdomen with evidence of prior surgery, but no localized mucosal thickening or obstructive changes were noted at that time. (Exhibit D15F/17; D16F/31, 35). During a follow up appointment, [Beach] reported persistent abdominal pain, nausea, and intermittent constipation. During the objective examination, tenderness was noted in the abdomen, as well as a tender questionable bulge in the mid abdomen and a firm abdominal wall. A second CT scan was ordered due to the concerning liver mass, and [Beach] was prescribed medication for nausea and vomiting. (Exhibit D16F). During an appointment with a GI specialist in September 2021, [Beach] continued lower abdominal cramping with no radiation. Physical examination findings were normal, with no worrying symptoms requiring a repeat colonoscopy. [Beach] was going to attempt IBGard for 1 month. (Exhibit D25F). A repeat CT scan was performed on October 5, 2021 revealed no acute intra-abdominal process and no evidence of hepatomegaly. Hepatic hemangioma were noted, as well as post-operative changes in the stomach and small bowel. However, there was no evidence of obstruction. (Exhibit D15F/13; D16F/26, 30).

A follow up appointment in October confirmed that the findings on the CT scan were consistent with hemangioma. [Beach] again requested surgery to assist in weight loss, and requested referral to plastic surgery for liposuction of her thighs. During the physical examination, [Beach] was described as morbidly obese, and tenderness was noted in the abdomen. [Beach] had a questionable bulge in the mid-abdomen that was tender to palpation, and the abdominal wall was firm. Excessively large folds of skin were noted in the upper and lower extremities, as well as an excessive panniculus. Other physical examination findings were largely normal, and [Beach] ambulated with a normal gait. [Beach] was referred to plastic surgery, and was again advised that a revisional surgery after a bypass might not be helpful. (Exhibit D16F). She reported ongoing abdominal pain in November 2021, stating this symptomology had worsened since she ran out of the medications she had been taking for weight loss. [Beach]'s allergies were described as well-controlled at that time. [Beach]'s physical examination noted tenderness in [Beach]'s abdomen. (Exhibit D17F). [Beach] presented to the emergency department for chest pain and tingling in January 2022, and during a follow up appointment she stated that a chest x-ray revealed an enlarged cardiac silhouette. She also stated that she felt that her blood pressure became elevated at times, and she experienced dizziness when this happened. However, [Beach] was not on any

medications for hypertension. [Beach] also requested medications for weight loss. During the physical examination, the findings were largely normal. [Beach]'s prescribed medications were refilled, and she was prescribed medication for blood pressure and started on a trial of weight loss medication. (Exhibit D26F).

[Beach] was treated for a urinary tract infection in January 2021 (Exhibit D26F), and when she presented to the emergency department in May 2022 with reports of epigastric pain, nausea, and chronic diarrhea, she was again treated for a urinary tract infection. (Exhibit D21F; D30F). [Beach] also presented throughout 2022 to follow up on her weight loss, and her weight was described as fluctuating. She eventually ran out of samples of her prescribed medication, and could not afford to get her own. [Beach] was interested in a new medication. During these appointments, [Beach] stated she had been exercising some days, walking and line dancing. Physical examination findings were largely normal, and her blood pressure was described as improved. (Exhibit D26F). Appointments in May and June 2022 note ongoing abdominal pain with a new onset of diarrhea. Further evaluation of the colon was scheduled. (Exhibit D25F). A colonoscopy performed on July 6, 2022 revealed diverticulosis in the sigmoid colon, but the examination was otherwise normal. A colon biopsy performed revealed superficial colonic mucosa with no evidence of chronic or active colitis. (Exhibit D25F/7-8). Though [Beach] continued to report abdominal pain, shortness of breath, and wheezing during an appointment in September 2022, physical examination findings were normal. Her abdomen was soft and nontender, and her lungs were clear to auscultation. (Exhibit D26F).

The record documents a history of treatment for musculoskeletal pain, with several surgical interventions noted prior to the alleged onset date. (Exhibit D6F; D7F; D22F). Though [Beach] has reported back pain through the relevant period, imaging has revealed only mild findings. (Exhibit D7F) and straight leg raise testing is routinely normal despite some notations of tenderness and pain in this area. (D1F; D18F; D23F; D26F). Furthermore, [Beach] reported that physical therapy has helped her back pain (Exhibit D23F), and pain medications have improved her functional abilities. (Exhibit D18F; D28F). [Beach] has also reported pain in her bilateral knees, and physical examination noted tenderness, limited motion, and other abnormalities in these extremities. However, [Beach] has routinely exhibited normal strength in all extremities on objective examinations. (Exhibit D1F; D18F; D23F; D26F). Consultative examinations noted slow or antalgic gaits (Exhibit D1F; D12F); however, treatment records routinely describe [Beach] as 'ambulatory' or indicate that her gait was normal despite other abnormalities. (Exhibit D8F; D17F; D18F; D23F; D26F; D28F). [Beach] has also indicated on multiple occasions that injections provided significant relief in her knee pain for a period of time, and that her medications helped her pain and improved her ability to perform her activities of daily living. (Exhibit D18F; D28F). [Beach] underwent surgery on her right knee in October 2022 (Exhibit D22F), and records following this surgery indicate that she was doing well. (Exhibit D27F). While an exacerbation in pain was noted in November 2022, imaging showed intact hardware (Exhibit D30F), and [Beach]'s gait was normal during pain management records

after this time. (Exhibit D28F). Physical therapy records also note improvement despite some continued weakness and limited range of motion. (Exhibit D29F). [Beach] also reports of abdominal pain and fatigue during the relevant period (Exhibit D8F; D16F; D17F; D25F), with objective imaging and testing revealing evidence of a hernia, hepatic hemangioma, and evidence of diverticulosis. (Exhibit D8F; D15F; D16F; D25F). However, while physical examination findings occasionally note tenderness or firm areas in the abdomen, findings in this area normal on many other occasions. (Exhibit D8F; D15F; D16F; D17F; D25F). [Beach] also reports respiratory issues (Exhibit D17F), though objective examination routinely notes normal respiratory findings. (Exhibit D1F; D17F; D26F). Furthermore, the records note that [Beach] has been capable of participating in significant activities, such exercising and dancing, despite her impairments. (Exhibit D26F; D29F).

The evidence outlined above supports the determination that, despite her reported impairments, [Beach] is capable of performing a range of light work. She can stand and walk for 4 hours in an 8-hour workday, and can sit for 8 hours in an 8-hour workday. Though she can never climb a ladder, rope, or scaffold and can never crawl due to her continued reports of pain, the many notations of a normal gait and strength support the determination that [Beach] can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. These findings also support the determination that [Beach] can perform occasional pushing and pulling with the bilateral lower extremities. To address the combined effect of [Beach]'s severe impairments, [Beach] must avoid work at unprotected heights and must avoid work around moving mechanical parts with vibrations and the use of vibratory tools. Due to [Beach]'s respiratory issues, she must avoid concentrated exposure to dust, fumes, odors, gases, and poor ventilation. Though [Beach] has used an assistive device during her surgical recovery, there is no evidence that [Beach] has required one throughout the relevant period, nor is there any evidence that she will continue to require one after her recovery. As noted above, her gait has been described as normal throughout the treatment records, and though [Beach] reported that she used an assistive device during the consultative examination in April 2021, she did not require it to ambulate during the evaluation.

In addition to the physical impairments outlined above, [Beach] also has a history of treatment for mental health symptomology. (Exhibit D11F; D13F). [Beach] presented to Centerstone Community Mental Health for symptomology associated with PTSD and bipolar disorder with psychotic features, the most recent episode depressed. [Beach] presented for individual therapy on July 21, 2020, the amended alleged onset date, and these records note progress in discussing the nature of her PTSD. Improvement in [Beach]'s mood was noted during a therapy appointment in August 2020. (Exhibit D13F). Indeed, during an appointment in August 2020, [Beach]'s affective and behavioral presentation was euthymic. [Beach] felt as though her symptoms were well-regulated with her medications, and she had shown progress toward an improvement in her mood and the ways in which she handled conflict. (Exhibit D11F). [Beach] showed progress in utilizing coping skills during an appointment in early September, and continued to show progress during

individual therapy in October 2020. By November 2020, [Beach] reported a decrease in her negative mood symptoms. (Exhibit D13F). During an appointment in January 2021, she reported a low stress level and mood stability, with no issues with her prescribed medications. (Exhibit D11F).

[Beach] participated in a consultative psychological examination in April 2021, and [Beach] reported ongoing outpatient therapy and medication management to treat her mental health symptomology. During this evaluation, [Beach] reported a "rocky" mood, including depression, suicidal thoughts, and worthlessness. She also reported auditory and visual hallucinations, frequent panic attacks and crying spells, and PTSD-related symptoms such as nightmares, intrusive thoughts, hypervigilant, and difficulty being around others. [Beach] reported difficulty with concentration and attention, as well as problems with her memory. [Beach] underwent an objective mental status examination at that time, and she was well-oriented and showed only mild difficulty with serial 3s. She could recall her date of birth and social security number, named comment objects, and repeated tongue-twisters without difficulty. [Beach] could follow a 3-step command, write a simple 3-word command sentence and perform the command, and could copy a design of two overlapping shapes without difficulty. Though she had difficulties naming 5 large U.S cities, she could name 4 U.S. presidents. She could not name the U.S. capitol, but could identify the shape of a ball and the colors of the American flag. [Beach] demonstrated a concrete understanding of commonly-used proverbs and showed good judgment in dealing with a situation. Overall, [Beach] interacted in a polite, cooperative, and friendly manner. Her mood was euthymic with a mood-congruent affect, though she had a few periods of tearfulness when sharing about more stressful and traumatic experiences. [Beach]'s thought content was mood congruent, and her thought process was overall logical and clear with some periods of being tangential and circumstantial. Overall, she was alert, appeared to readily built rapport with the examiner, and put forth good effort. She was estimated to be of average intelligence. [Beach] was diagnosed with persistent depressive disorder (dysthymia) and post-traumatic stress disorder, and bipolar II disorder was ruled out. (Exhibit D12F).

[Beach] continued treatment with Centerstone Community Mental Health, and records from May 2021 note slight improvement. These records note that [Beach] demonstrated increased competence in managing her psychiatric symptoms, with [Beach] reporting improvement and compliance with her medication regimen. Records from June 2021 note an increase in mood swings and anxiety, but [Beach] reported that she had been out of her medications for over 6 months. During this appointment, [Beach]'s mood was stable, however. Her affect was appropriate, and she weas described as alert and focused. Her thought process was organized and logical, and her vocabulary and intelligence were both described as average. Her recent and remote memory were intact. Though her insight into her psychiatric condition was only described as fair, her judgment was intact. During an appointment later in June, [Beach] reported progress in utilizing coping skills. [Beach] reported a manic episode in July 2021, as well as continued PTSD-related symptoms. During an individual therapy session in July, she was calm and

cooperative, however. (Exhibit D14F). No significant mental health treatment is noted after that time until October 2021, and during an appointment at that time [Beach] reported that she had been out of medications for 4 months. She was experiencing mood swings and anxiety due to being out of medications, and stated that she had not followed up with a therapist in several months. During an appointment in November, [Beach] showed slight progress, as [Beach] had been attending most of her appointments. She reported some fatigue and little interest in activities, as well as periods of depression. (Exhibit D14F; D24F).

[Beach] again reported a manic episode and continued symptomology associated with PTSD in December 2021. However, [Beach] had been non-complaint with her therapy appointments. [Beach] reported depression in January 2022, but later in January reported stability on her medication regimen. During a mental status examination, [Beach]'s mood was euthymic and her affect appropriate. Her insight was good and her judgment was intact, and she was oriented to person, place, and time. Her thought processes were organized and appropriately abstract, and her thought associations were intact. Recent and remote memory were intact as well. [Beach] was described as alert and focused, and she was described as having average intelligence and vocabulary. [Beach] reported no change in her mental health symptoms in February 2022, but also stated that she forgot to take her medications as prescribed at times. She reported a decrease in symptoms by March. [Beach] was discharged from services in April 2022 because she did not return for recommended services. (Exhibit D24F). Anxiety, panic attacks, and depression were noted during treatment appointments in May and June 2022, and increased stress was noted in September 2022. (Exhibit D26F).

Though [Beach] has reported exacerbations of symptomology during the relevant period, the record also notes periods of non-compliance with [Beach]'s recommended treatment records. She routinely reports notable improvement when actively participating in treatment. (Exhibit D11F; D13F; D14F; D24F). Treatment records describe [Beach] as alert and focused, with an organized thought process and average intelligence. [Beach] had an intact memory, and is routinely described as calm and cooperative. (Exhibit D14F; D24F). Though [Beach] had some difficulty with tasks during the consultative psychological examination, she was well-oriented, could follow commands, and demonstrated good judgment. Her mood was euthymic, and she interacted in a polite, cooperative, and friendly manner. (Exhibit D12F). [Beach] also reports the ability to perform significant activities of daily living, including cleaning her household, shopping, driving, caring for a pet, and participating in social activities like line dancing. (Hearing Testimony; Exhibit D4E; D8E; D9E; D26F; D29F). Therefore, the record supports the determination that [Beach] can understand and remember simple instructions and can use judgment to make simple work-related decisions. [Beach] can adapt to routine changes in the work setting that are occasional in nature.

As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical

opinion(s), including those from medical sources. The undersigned has fully considered the medical opinions and prior administrative medical findings as follows:

Upon initial review, the state agency medical consultant opined that [Beach] could perform a range of light work, if limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. The state agency opined that [Beach] could never climb ladders, ropes, or scaffolds, and should avoid concentrated exposure to pulmonary irritants. (Exhibit D2A; D3A). The undersigned finds this opinion to be partially persuasive. The determination that [Beach] could perform light work is supported by the overwhelming objective evidence, including imaging and response to treatment such as medication management and surgical procedures during the relevant period. However, the state agency was unable to support their findings with the most updated evidence, which notes ongoing issues in the bilateral knees and back and persistent reports of respiratory symptomology. This evidence is consistent with additional limitations on [Beach]'s ability to stand and walk, as well as manipulative and environmental limitations not contemplated by the state agency when they rendered this opinion. Therefore, the undersigned can only find this opinion to be partially persuasive.

Upon reconsideration, the state agency again opined that [Beach] could perform a range of light work, could never climb ladders, ropes, or scaffolds, and could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The state agency further opined that [Beach] should avoid concentrated exposure to vibration, pulmonary irritants, and hazards. (Exhibit D6A; D7A; D10A; D11A). The undersigned finds this opinion to be generally persuasive. This opinion is supported by more updated evidence than the initial review discussed above. As noted above, the determination that [Beach] could perform a range of light work is consistent with [Beach]'s response to treatment and the normal strength and normal gait routinely noted in the treatment records. However, [Beach]'s ongoing knee problems, recovery from knee replacement, persistent reports of back pain, and history of respiratory issues are more consistent with limiting [Beach] to no more than 4 hours of standing and walking in a workday. Nevertheless, this opinion is well-supported and largely consistent with the objective evidence, and the undersigned therefore finds it to be generally persuasive.

Dr. Brian Bingham, the consultative examiner who evaluated [Beach] in April 2021, diagnosed [Beach] with osteoarthritis, degenerative disc disease of the lumbar spine, obesity, and migraines by history. Dr. Bingham opined that [Beach] could occasionally lift and carry less than 10 pounds, could frequently lift and carry less than 10 pounds, and could stand and walk for less than 2 hours in an 8-hour workday. He found no restrictions on [Beach]'s ability to sit. The diagnoses rendered by Dr. Bingham are consistent with the findings in the objective medical records. However, his limitation of [Beach] to a range of sedentary work is not supported by his own examination, and is inconsistent with the record as a whole. While his examination notes an antalgic gait, tenderness, limited range of motion, and difficulty with tasks such getting up out of the chair or onto an examination

table, [Beach]'s strength was 5/5 in all major muscle groups, and straight leg testing and Romberg testing were negative. [Beach] did not require an assistive device to ambulate at that time. (Exhibit D1F). The treatment records routinely describe [Beach] as having a normal gait (Exhibit D8F; D17F; D18F; D23F; D26F; D28F), and [Beach] reported improvement in her functional abilities with injections, medication management and physical therapy. (Exhibit D23F; D18F; D28F; D29F). [Beach] has also been recovering well following her recent knee replacement (Exhibit D22F; D27F; D28F; D30F). This evidence is more consistent with the determination that [Beach] could perform a range of light work. As this opinion is not supported by the objective examination at the time it was rendered and is not consistent with the record as a whole, the undersigned can only find it persuasive with regards to the diagnoses rendered, and not as to the functional limitations placed on [Beach].

Upon initial review, the state agency found severe mental limitations. They opined that [Beach] would be able to understand, remember, and carry out simple and lower-level detailed work instructions, but no complex or executive work. The state agency further opined that [Beach] was limited to occasional changes in a work setting. (Exhibit D2A; D3A). The same limitations are noted upon reconsideration, and moderate limitations were noted in [Beach]'s ability to concentrate, persist, and maintain pace and in her ability to adapt and manage herself. Mild limitations were noted in her ability to understand, remember, and apply information and in her ability to interact with others. (Exhibit D6A; D7A; D10A; D11A). The undersigned finds this opinion to be partially persuasive. Though well-supported by the evidence available to the state agency at the time they rendered their opinion, [Beach]'s mental health symptomology combined with her pain and fatigue are more consistent with moderate limitations in all areas of mental functioning except for her ability to interact with others. However, the determination that [Beach] would be capable of performing unskilled work and adapting to occasional changes in a work setting is consistent with the many normal findings on mental status examinations throughout the relevant period, as well as [Beach]'s significant reported activities of daily living. A mild limitation in interacting with others is consistent with her routinely cooperative attitude and ability to perform significant activities in public despite her reports of social difficulties. As these opinions are well-supported and are largely consistent with the overall evidence, the undersigned finds them to be partially persuasive despite the support for a moderate limitation in understanding, remembering, and applying information in the objective treatment records.

Dr. Shari K. Neul, the consultative psychological examiner who evaluated [Beach] in April 2021, opined that [Beach] had mild to moderate difficulties with her mood. Dr. Neul opined that [Beach]'s symptoms did not appear to significantly impact her ability to engage in activities of daily living, but her symptoms may pose mild to moderate difficulties in the workplace when certain conditions were present, such as tensions between coworkers, unsupportive supervisors or management, work involving moderate physical activity and stamina, and perceiving the work environment and/or persons in the environment as dangerous or unsafe. (Exhibit

D12F). The undersigned also finds this opinion to be partially persuasive. The diagnoses are consistent with the treatment records. Furthermore, the determination that [Beach] has no more than moderate limitations in any area of mental functioning is consistent with the many normal mental status examinations noted throughout the relevant period, as well as [Beach]'s noted improvement with treatment and her significant reported activities of daily living. However, any limitations in interaction considered by Dr. Neul are not supported by her cooperative, engaged attitude during the consultative examination, and are not consistent with her ability to routinely engage with others in public for activities like line dancing. As this opinion is not entirely supported by the objective examination findings and is only somewhat consistent with the overall evidence, the undersigned can only find it to be partially persuasive.

Based on the foregoing, the undersigned finds [Beach] has the above residual functional capacity assessment, which is supported by [Beach]'s response to treatment, the imaging and testing in the record, the objective examination findings throughout the relevant period, and [Beach]'s reported activities of daily living. The evidence outlined above supports the determination that [Beach] could perform a range of light work, and could stand and walk for 4 hours in an 8-hour workday. Though [Beach] can never climb a ladder, rope, or scaffold or crawl, she can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. [Beach] can also perform occasional pushing and pulling with the bilateral lower extremities. To address the combined effect of her impairments, [Beach] must avoid work at unprotected heights, must avoid work around moving mechanical parts with vibrations and the use of vibratory tools, and must avoid concentrated exposure to dust, fumes, odors, gases, and poor ventilation. Despite her mental impairments, [Beach] can understand and remember simple instructions and can use judgment to make simple work-related decisions. [Beach] can adapt to routine changes in the work setting that are occasional in nature.

(AR 60–74.)

Beach states that she has a "history of [ ] mental, physical, [and] emotional illnesses" that have "gotten worse" since she was a child. (Doc. No. 16, PageID# 2044.) She also refers to "sexual [abuse]" that she experienced as a child. (*Id.*) Beach points out that she has "had several surgeries" for her physical impairments, including knee replacement surgeries, and states that she "needs to have another surgery on both knees now." (*Id.* at PageID# 2045.) Beach states that "[her] blood pressure starting high is an issue for [her] . . . ." (*Id.*) Beach further states that she has PTSD, anxiety, and bipolar disorder and experiences panic attacks. (*Id.*) Beach points out that she has "to

take medicine for [her] many issues " and that she "can't stand or sit for a long time without pain. . . ." (*Id.*)

Beach states that she "[does not] think that [the ALJ] looked at all of [her] records" in determining whether she is disabled. (Doc. No. 16, PageID# 2045.) The SSA has promised DIB and SSI claimants that it "will consider all evidence in [the] case record" when determining disability claims. 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). However, "the ALJ need not expressly mention every piece of evidence" he or she considered in the written opinion "so long as the overall decision was supported by substantial evidence." *Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 250 (6th Cir. 2015) (first citing *Loral Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999); and then citing 20 C.F.R. § 404.953); *see also Big Branch Res., Inc. v. Ogle*, 737 F.3d 1063, 1072 (6th Cir. 2013) ("[W]e do not require the ALJ to remark on every piece of evidence. . . . Our review is whether the ALJ's decision rests on substantial evidence.").

Here, the ALJ considered and discussed extensive record evidence regarding Beach's physical and mental impairments, including, but not limited to, her surgeries, knee problems, blood pressure, PTSD, anxiety, bipolar disorder, and panic attacks. (AR 60–74.) The ALJ did not expressly mention the sexual abuse that Beach survived as a child.[3] But the ALJ considered and discussed Beach's PTSD, including Dr. Neul's opinion and Beach's Centerstone treatment records. The ALJ also considered and discussed the effects of prescribed medications on Beach's physical and mental impairments and symptoms. (*Id.*) And the ALJ considered and discussed

---

[3]     The record shows that Beach told consulting psychological examiner Dr. Neul that "around age 7 she was sexually abused by a neighbor and a family member. This abuse occurred until about age 11." (AR 1323.) Neul diagnosed Beach with PTSD, among other mental impairments, and found that Beach "experience[es] PTSD symptoms related to her trauma and abuse history." (AR 1325.) The record also contains Beach's treatment records from Centerstone Community Mental Health showing that Beach experienced childhood sexual abuse and related PTSD symptoms. (AR 1276–1320, 1327–1499, 1742–92.)

whether Beach's testimony about her symptoms, including pain, was consistent with the overall record evidence.

Beach has not identified any specific evidence that the ALJ failed to consider. Instead, she "presents the same evidence the ALJ discussed and requests that this Court reach a different outcome—an impermissible request to reweigh the evidence." *Incorvia v. Comm'r of Soc. Sec.*, Case No. 1:22-CV-01911, 2023 WL 6519152, at *9 (N.D. Ohio Sept. 20, 2023), *report and recommendation adopted*, 2023 WL 6519082 (N.D. Ohio Oct. 5, 2023). Even if the evidence Beach identifies "is considered to be substantial, it is insufficient on its own to warrant reversal." *Shelton v. Comm'r of Soc. Sec.*, Case No. 2:18-cv-00093, 2020 WL 707586, at *9 (M.D. Tenn. Feb. 12, 2020), *report and recommendation adopted sub nom. Shelton v. Saul*, 2020 WL 1284628 (M.D. Tenn. Mar. 18, 2020). This Court must defer to an ALJ's finding that is supported by substantial evidence "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see also id.* ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." (alteration in original) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). The ALJ based the determination of Beach's RFC on numerous medical records and opinions. Beach has not shown that the ALJ's determination lacks the support of substantial record evidence.

Beach also argues that she is "not able to work how [she] did years ago." (Doc. No. 16, PageID# 2045.) The ALJ agreed with Beach on this point, finding that she "is unable to perform past relevant work as" a home health aide because of her current medically determinable impairments. (AR 74.) However, the ALJ also found, based on vocational expert testimony, that Beach can perform other work—specifically as a mail sorter, routing clerk, merchandise marker,

document preparer, tube operator, or printed circuit board inspector—and that these jobs exist in significant numbers in the national economy. (AR 74–75.) Beach has not shown that this finding lacks the support of substantial record evidence.

## IV.     Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that Beach's motion for judgment on the administrative record (Doc. No. 16) be DENIED and the Commissioner's disability determination be AFFIRMED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 15th day of August, 2025.

ALISTAIR E. NEWBERN
United States Magistrate Judge